# Exhibit B

STATE OF NEW YORK
DEPARTMENT OF ENVIRONMENTAL CONSERVATION
625 BROADWAY
ALBANY, NEW YORK 12233-1550

In the Matter

- of -

the Notice of Intent to Revoke a Special License Issued
Pursuant to Environmental Conservation Law (ECL)
Sections 11-0511 and 11-0515, and Part 175 of
Title 6 of the Official Compilation of Codes, Rules and Regulations
of the State of New York (6 NYCRR) to:

**CARRIE M. LEO,**

Respondent.

DEC Case No. OHMS 2017-72265

HEARING REPORT

-by-

_____/s/_____
Richard A. Sherman
Administrative Law Judge

July 20, 2018

# PROCEEDINGS

The Director of the New York State Department of Environmental Conservation (DEC or Department), Division of Fish and Wildlife, issued a Notice of Intent to Revoke License (notice of intent) to respondent Carrie M. Leo on August 14, 2017.  The notice of intent advised respondent that the Department intended to revoke her License to Collect or Possess: Education/Exhibition (LCPEE).  An LCPEE authorizes the permittee to collect and possess certain species of wildlife for education or exhibition purposes.  By letter dated August 22, 2017 respondent advised the Department that she opposed the revocation of her LCPEE and requested a hearing.  Where, as here, a proceeding arises out of Department staff's notification of its intent to revoke a license and the licensee requests a hearing, the notice of intent takes the place of a complaint and the request for a hearing takes the place of an answer (see 6 NYCRR 622.3[b][2]).

Department staff alleges that respondent possessed regulated wildlife without authorization and failed to comply with requirements of her LCPEE.  These alleged violations, staff asserts, warrant revocation of respondent's license.

The matter was originally assigned to Administrative Law Judge (ALJ) D. Scott Bassinson.  In accordance with 6 NYCRR 622.9(e), ALJ Bassinson issued a notice of hearing, dated December 15, 2017, by which he advised the parties that a hearing on this matter would be held on March 13, 2018 at the Department's Region 8 offices in Avon.  By letter dated February 16, 2018, the parties were advised that the matter was reassigned to me.

In accordance with the notice of hearing, I convened the hearing in this matter on March 13, 2018.  The hearing was conducted pursuant to the provisions of the Department's uniform enforcement hearing procedures (6 NYCRR part 622).  Department staff was represented by Mark D. Sanza, Assistant Counsel, Office of General Counsel.  Mr. Sanza called one witness on behalf of staff: Joseph Therrien, Biologist 2, Unit Leader, Special Licenses Unit, DEC.  Ms. Leo represented herself and testified on her own behalf.  A list of the exhibits received into evidence is appended to this hearing report.

I provided copies of the hearing transcript to the parties via email on March 23, 2018.  By agreement of the parties, closing briefs were due within four weeks of the date that I circulated the transcript.  Accordingly, closing briefs were due by no later than 5:00 p.m. on April 20, 2018 (see letter to the parties dated March 16, 2018; email to the parties dated March 23, 2018).  At the request of respondent, and with the consent of Department staff, I extended the filing date on two occasions.

The last date that I established for filing closing briefs was April 30, 2018 (see email to the parties dated April 26, 2018).  Department staff timely filed its closing brief before close of business on April 30, 2018.  Respondent, however, did not.  Respondent instead requested an extension to midnight (see email from respondent dated Apr. 30, 2018).  On May 1, having not received respondent's closing brief, I advised respondent that her filing was late and directed her to file immediately (see email to the parties dated May 1, 2018).  Respondent advised that she was having difficulty accessing the internet, but she eventually was able to file before close of business on May 1, 2018 (see email exchange with the parties dated May 1, 2018).

1

    Although I had stated that Department staff could, at its discretion, file a motion objecting to respondent's late filing, staff did not file an objection. On May 4, 2018, respondent inquired whether she could file a "corrected version" of her closing brief. I denied respondent's request but authorized her to direct my attention to any errors in her closing brief (see email to the parties dated May 7, 2018). I held the record open for several days, but nothing further was filed by either party and, therefore, I closed the hearing record on May 14, 2018.

    On June 15, 2018, respondent advised that she recently had "a chance to look over the summation" that she had filed more than six weeks previously, and she realized that it was "a very rough[] draft" (email from respondent dated June 15, 2018). Respondent requested permission to "submit the actual summation" (id.). I denied respondent's request (see email to the parties dated June 21, 2018).

## FINDINGS OF FACT

1. Respondent resides at 3199 Walworth Road, Walworth, New York, and operates a facility for captive wildlife (facility) at that location (transcript [tr] at 117; exhibit 2 at 1 [licensee information]).

2. The Department issued LCPEE #623[1] to respondent in 2013 (tr at 13). The most recent version of LCPEE #623 was issued by the Department on July 8, 2015 and was effective from that date through July 7, 2016 (id.; tr at 10; exhibit 2 at 1).

3. Respondent submitted a request to amend LCPEE #623 to the Department on March 24, 2016 (exhibit 5). Respondent's amendment request remained pending before the Department at the time that the Department issued the notice of intent to respondent (tr at 34-35).

4. The Department issued the notice of intent to revoke LCPEE #623 to respondent on August 14, 2017 (exhibit 3).

5. The Department issued wildlife rehabilitation license (WRL) #1646 to respondent on January 9, 2012 (exhibit 4 at 1). WRL #1646 was effective, with modifications, from January 9, 2012 to December 31, 2016 (id.).

6. The Department denied respondent's request to renew WRL #1646 on August 14, 2017 (exhibit 12).

7. Respondent acquired 6 coyotes under her WRL in April 2015 from a facility in Watertown, New York (tr at 81, 111).

8. The six coyotes were approximately two to three weeks old at the time she acquired them (tr at 111 [Leo testimony that she acquired the coyotes "around when their eyes were opening . . . about two or three weeks [old]"]).

---

[1] Note that respondent's LCPEE license, LCPEE #623, is sometimes erroneously denoted in the record as LCPEE "number 626" (see e.g. exhibit 3 at 1).

9.  Respondent acquired at least five Virginia opossums sometime prior to August 14, 2015 under her WRL (exhibit 5 at 2 [letter from respondent's veterinarian stating that as of August 14, 2015 respondent had "[s]everal opossum" at her facility that "had been in captivity a period of time"]; see also exhibit 15, Jan. 13, 2016 inspection report at 3 [noting that there were six Virginia opossums at respondent's facility on September 21, 2015][2]).

10. As of August 14, 2015, the opossums at respondent's facility were "quite habituated" to humans (exhibit 5 at 2 [letter from respondent's veterinarian]; see also exhibit 8 at 2 [DEC Report of Inspection, May 10, 2016 inspection, stating that respondent "has 5 habituated opossums, 4 from one litter that she raised"]).

11. LCPEE #623 condition 22 required respondent to submit an accurate and complete Fish and Wildlife Education/Exhibition Report Form prior to July 7, 2016, the expiration date of respondent's most recent one-year LCPEE license (exhibit 2 at 1, 3; ECL 11-0515[1] [providing that "[s]uch license shall be in force for only one year"]).

12. LCPEE #623 general condition 4.iv provides that respondent's LCPEE license may be revoked for "fail[ure] to comply with any provisions of . . . Federal laws or regulations of the department directly related to the licensed activity" (exhibit 2 at 4).

13. Respondent is required to hold a USDA Class C exhibitor's license in relation to her exhibition of animals held under her LCPEE license and respondent's facility is subject to routine inspections by USDA personnel (exhibit 2 at 2 [condition 7 (USDA license requirement)]; tr at 40-42; exhibit 15 [copies of USDA inspection reports for respondent's facility]).

## DISCUSSION

Department staff bears the burden of proof on all its charges and must prove the factual allegations underlying those charges by a preponderance of the evidence (see 6 NYCRR 622.11[b][1], [c]).  Where a respondent asserts an affirmative defense, the respondent bears the burden of proof and must prove facts in support of the defense by a preponderance of the evidence (see 6 NYCRR 622.11[b][2], [c]).

### Department Allegations

Pursuant to 6 NYCRR 175.5(a), the grounds upon which the Department may revoke respondent's LCPEE license include, among other things, (i) a failure to comply with any term or condition of the license; (ii) an exceedance of the scope, purpose, or activities described in the application; or (iii) a failure to comply with any provision of State or Federal law or regulation

---

[2] Exhibit 15 contains six USDA inspection reports for respondent's facility from the years 2015 and 2016. For ease of reference, citations to exhibit 15 identify the date of the cited inspection report.  Note that several of the inspection reports include an attachment entitled "Animal Inspected at Last Inspection" which lists animals that were at the facility on the date of the previous USDA inspection (see e.g. exhibit 15, June 15, 2015 inspection report at 3).

directly related to the licensed activity.  These grounds for revocation are also set forth in respondent's LCPEE license (see exhibit 2 at 4 [condition 4]).

The Department issued the notice of intent to respondent by letter dated August 14, 2017.  The notice of intent sets forth four reasons for the revocation:

"1) Unauthorized possession of wildlife without a proper license from the Department;

"2) Failure to keep accurate records and submit timely reports to the Department;

"3) Failure to comply with terms and conditions of [respondent's] special licenses issued by the Department; [and]

"4) Failure to comply with the terms of a federal license directly related to the activity authorized by [LCPEE #623]."

By letter dated August 22, 2017, respondent stated that she disagreed with the Department's decision to revoke her license and requested a hearing on the matter.

The reasons cited by the Department for revoking respondent's LCPEE license are discussed below, seriatim.

Unauthorized Possession of Wildlife

The notice of intent, which serves as the complaint in this matter, states that respondent "possess[ed] and fail[ed] to release to the wild in a timely manner six (6) wild coyote . . . and four (4) Virginia opossum" (exhibit 3 at 1).  The notice of intent also states that respondent's veterinarian evaluated several opossums and six coyotes at respondent's facility in August 2015 and found them to be too habituated to humans for release (id. at 1-2).  The notice of intent asserts that respondent knew that these animals were "non-releasable and therefore not rehabilitation candidates" and that, despite this, respondent continued to possess these animals and did not contact the Department to add the animals to LCPEE #623 until March 2016 to add the coyotes, and July 2016 to add the opossums.

-- Coyotes

Respondent's LCPEE license does not authorize respondent to possess coyotes (see exhibit 2 at 2 [condition 1 (listing the species that respondent is authorized to possess)]).

Staff's expert, Mr. Therrien, testified that Ms. Leo held "numerous species" without authorization from the Department (tr at 40).  He testified that these species included six coyotes that were acquired and held without a license (id.).  He further testified that during a November 2015 inspection of respondent's facility, Department staff "noted that the coyotes came right up to them and that more than one had a collar around its neck" (tr at 49).

The record includes a letter from respondent's veterinarian stating that on August 14, 2015, respondent had "[s]ix coyote pups" at her facility that appeared to be in good health, but that also "appeared too socialized towards humans for release" (exhibit 5 at 2).

4

The record also includes an undated letter from the Indiana Coyote Rescue Center (ICRC), stating that none of the six coyotes "are releasable due to their social acceptance of their caretakers, their stay in captivity from before their eyes opened, and comfortability around strangers" (exhibit 5 at 3).  The ICRC letter further states that the coyotes are "far too socialized to thrive in the wild," but notes that respondent "has shown herself to be willing to learn everything necessary to provide appropriate care for these animals" should they remain in captivity (id.).

Although the ICRC letter is undated, it is referenced in, and attached to, a January 25, 2016 letter from respondent's veterinarian (exhibit 5 at 2).  In subsequent correspondence with the Department, the ICRC states that it was contacted by respondent in relation to the coyotes in December 2015 (exhibit 10 at 2).  Accordingly, ICRC's assessment that the coyotes were non-releasable was made in the December 2015 to January 2016 time period.  This time period closely coincides with timing of Department staff's November 2015 inspection of respondent's facility at which staff "noted that the coyotes came right up to them" (tr at 49 [Therrien testimony]).

Ultimately, Department staff determined that the six coyotes were "raised in such a way that they became too habituated to humans to be released" (exhibit 8 at 2) and, therefore, the Department confiscated the coyotes on May 10, 2016 (id. at 4).  The Department's Regional Wildlife Manager, Region 4, participated in the May 10, 2016 inspection of respondent's facility and noted that respondent "cooperated fully with the removal of the coyotes from her facility, although she did express interest in [regaining] possession of 2 of them under her LCPEE" (id. at 4).

There is no testimony or other evidence in the record that indicates that the coyotes were releasable at any time during their captivity with respondent.  Indeed, respondent testified that the coyotes may have been habituated to humans even before she acquired them (tr at 81 [Leo testimony that a prior rehabilitator had kept the coyotes in his house, which may be "one of the reasons . . . why they were habituated"]).  Nor is there testimony or other evidence indicating that respondent was actively working to prepare the coyotes for eventual release to the wild.  Rather, the record demonstrates that from early in their captivity until they were removed from respondent's property, a period of over a year, the coyotes were consistently found to be overly habituated to humans.

On this record, it is clear that respondent was not rehabilitating the coyotes pursuant to the terms and conditions of her wildlife rehabilitation license (WRL).  Respondent's WRL does not authorize her to possess animals that are not being rehabilitated (see exhibit 4 at 4 [WRL condition 21 (stating that "[w]ildlife that has been successfully rehabilitated shall be immediately released to the wild and that "[t]his [WRL] license does not authorize permanent possession of wildlife"); id. [WRL condition 23 (stating that "[w]ildlife deemed incapable of surviving if released to the wild shall be euthanized or may be transferred to another individual who possesses a valid license to possess [the] non-releasable animal")]).  Rather, respondent's WRL only authorized respondent "to provide rehabilitative care" to wildlife (exhibit 4 at 2 [WRL condition 1]).

5

As set forth under 6 NYCRR 184.1(a), "[t]he purpose of this Part [wildlife rehabilitators] is to establish a specially trained group of individuals, collectively called wildlife rehabilitators, to provide for the care of injured and debilitated wildlife <u>so that such wildlife may be returned to the wild</u>" (emphasis supplied; <u>see</u> also New York State Wildlife Rehabilitation Study Guide [2013], at 7 [defining wildlife rehabilitation as "the practice of legally caring for sick, injured, orphaned or displaced wildlife in order to release a physically healthy and psychologically sound animal back into the wild"]).

If an animal held by a wildlife rehabilitator is not being rehabilitated it must be released to the wild or, if not releasable, it must be euthanized or transferred to another person who is authorized to possess the animal (<u>see</u> exhibit 4 at 4 [WRL conditions 21, 23]).

Respondent was questioned at the hearing regarding why she did not consider releasing the coyotes by August 2015, when it became clear that the coyotes were too habituated to humans. Respondent testified that the coyotes were too small to release and that they "would have been killed" (tr at 122). She further testified that, at that age, the coyotes "would be with their mother learning how to hunt" and other survival skills (tr at 122-123). Respondent concluded that to release them without these skills would result in starvation or dehydration and she stated that she "would be surprised if any of them would have survived" (tr at 123).

As stated in the New York State Wildlife Rehabilitation Study Guide (2013),

"rehabilitation is about doing the best thing for the animal, and often euthanasia is the best thing. **Your license does not allow you to be a long-term holding facility for non-releasable animals. These are wild animals that may not do well in captive situations.** Rehabilitators must ask themselves very serious 'quality of life' questions. No animal should spend its life in a cage because a rehabilitator can't face a euthanasia decision" (<u>id.</u> at 13-14).

Although respondent argues that she did not intentionally habituate the coyotes, her methods of caring for the animals resulted in the coyotes being overly socialized to humans. Respondent held the six coyotes in captivity for over a year and was not providing rehabilitative care. That is, respondent was not providing care "so that such wildlife may be returned to the wild" (6 NYCRR 184.1[a]). Accordingly, regardless of respondent's intentions at the time she acquired the coyotes, she was not rehabilitating the coyotes and her possession of the animals was not authorized by her WRL license.

I conclude that Department staff met its burden to demonstrate that respondent possessed six coyotes in violation of her LCPEE license. I further conclude that respondent was not rehabilitating the coyotes for release to the wild and, therefore, respondent was not authorized to possess the coyotes under her WRL license.

-- Opossums

Respondent's LCPEE license authorizes her to possess one Virginia opossum (<u>see</u> exhibit 2 at 2 [condition 1]).

6

As noted above, the notice of intent states that respondent "possess[ed] and fail[ed] to release to the wild in a timely manner . . . four (4) Virginia opossum" (exhibit 3 at 1). Department staff's expert, Mr. Therrien, testified that Ms. Leo held "numerous species" without authorization from the Department (tr at 40). He testified that these species included opossums that were acquired and held by respondent without a license (id.).

The record includes a letter from respondent's veterinarian which states that respondent had "[s]everal opossum" at her facility as of August 14, 2015. The letter further states that the veterinarian evaluated the opossums and that they were "found in overall good health," but "had been in captivity for a period of time and were quite habituated" to humans. The letter also notes that respondent had "previous negative experiences in releasing long-captive opossum (resulting in deaths and inappropriate interactions with humans)" and was "hesitant to release [the opossums] at that time." Lastly, the veterinarian states that the opossums "might do well in larger enclosures, transferred for permanent placement." (Exhibit 5 at 2.)

Department staff proffered USDA inspection reports which indicate that respondent had a total of 13 animals at her facility as of June 18, 2015, one of which was a Virginia opossum (exhibit 15, Sept. 21, 2015 inspection report at 2[3]). The USDA inspection reports further state that, by September 21, 2015, respondent had a total of 33 animals at her facility, which then included six Virginia opossums (id., Jan. 13, 2016 inspection report at 3).

During the Department's May 10, 2016 inspection of respondent's facility, Department staff confirmed that respondent continued to possess "5 habituated opossums, 4 from one litter that she raised" (exhibit 8 at 2 [noting that "one of the 5 may be the one already listed on the LCPEE"]). Respondent was authorized under LCPEE #623 to possess one Virginia opossum (id. at 2-3; exhibit 2 at 2 [condition 1]).

At the hearing, respondent testified that she "tried very hard [but] was very overwhelmed with other animals, opossums being one of them" (tr at 86). She testified that she held six opossums for a year and that "a lot of rehabilitators have problems with opossums" (id.). She further testified that "[t]he year that I had the six [opossums], there was a trend of some type of bacterial infection that a lot of them were getting" (id). She testified that "the treatment [of the opossums] is so long that, of course, they are going to be habituated. You're handling them. You're medicating them. Some of them had to be syringed at one point" (tr at 86-87). The timing of respondent's efforts to treat the opossums is not established on the record, but as noted above, respondent's veterinarian found the opossums to be "in good overall health" as of August 14, 2015 (exhibit 5 at 2).

The notice of intent alleges that respondent possessed and failed to release to the wild "four (4) Virginia opossum" (exhibit 3 at 1). Consistent with that allegation, the record establishes that respondent held at least five opossums while her LCPEE license only authorized her to possess one. The record further establishes that beginning sometime prior to August 14,

---

[3] As previously noted, several of the inspection reports include an attachment entitled "Animal Inspected at Last Inspection" which provides a listing of animals that were at the facility on the date of the previous USDA inspection.

2015, the opossums held by respondent became too habituated to humans to be released into the wild and, therefore, were not authorized under respondent's WRL license.

I conclude that Department staff met its burden to demonstrate that respondent possessed four Virginia opossums at her facility in violation of her LCPEE license. I further conclude that respondent was not rehabilitating the opossums for release to the wild and, therefore, respondent was not authorized to possess the opossums under her WRL license.

Failure to Keep Accurate Records and Submit Timely Reports

The notice of intent states that respondent violated LCPEE #623 by her "[f]ailure to keep accurate records and submit timely reports to the Department" (exhibit 3 at 1 [item 2]). At the hearing, staff's expert testified that respondent pleaded guilty in Macedon Town Court to violating condition 22 of her LCPEE which required respondent to submit an accurate and complete LCPEE report form to the Department prior to the expiration date of LCPEE #623 (tr at 46-47; see also exhibit 2 at 3 [condition 22]).

Department staff proffered copies of eleven tickets that were issued to respondent by the Department's Division of Law Enforcement after the May 10, 2016 inspection of respondent's facility (tr at 34; exhibit 9). One of those tickets, ticket number BF0195333, alleges that respondent violated LCPEE #623 condition 22 (exhibit 9 at 1). Staff also proffered the certificate of conviction from the Macedon Town Court, Criminal Part, which establishes that respondent pleaded guilty to the violation of condition 22 (see exhibit 13 at 2 [noting that respondent pleaded guilty (denoted as "PG" under the disposition column) to the violations charged under two of the tickets, including ticket number BF0195333]; see also tr at 132 [Leo admission that she pleaded guilty to two violations]).

Respondent argues that the "two convictions to which [she] pled in town court were baseless" (respondent brief at 6 [emphasis omitted]). Respondent does not, however, contest the allegation that she failed to submit an accurate and complete LCPEE report form as is required under condition 22 of her LCPEE. Rather, respondent argues that Department staff should have given her an opportunity to correct the violation (id. at 6-7).

On this record, I conclude that Department staff met its burden to establish that respondent violated condition 22 of her LCPEE by her failure to submit an LCPEE report form.

Failure to Comply with Terms and Conditions of Special License

The notice of intent lists several conditions of LCPEE #623 that respondent is alleged to have violated (see exhibit 3 at 3). Among these is LCPEE #623 condition 22 which is discussed above. In addition, the notice of intent cites condition 6 ("licensee shall not add additional animals or replace listed animals without a written amendment to this license"), condition 10 ("licensee shall provide . . . caging facilities to ensure the physiological and psychological well-being of the listed animal(s)"), and condition 12 (licensee shall comply with all notifications

8

required by the New York State General Municipal Law Section 209-cc for all listed animals subject to that law")[4] (id.).

-- LCPEE #623 condition 6

LCPEE #623 condition 6 states that "[t]he licensee shall not add additional animals or replace listed animals without a written amendment to this license" (exhibit 2 at 2).

The notice of intent identifies several species that respondent allegedly possessed prior to seeking an amendment to her LCPEE license (see exhibit 3 at 1-3). At the hearing, Department staff's expert testified that there were "multiple occurrences" where respondent sought to amend her LCPEE license to add animals that she already possessed (tr at 23). He further testified that "[t]he coyotes, . . . [o]possum, [and] chipmunks were acquired without license amendment and that's what I can verify" (tr at 40).

Department staff states that respondent "admitted that she actually had obtained the 6 Eastern coyotes in April 2015, nearly a full year before she submitted her [LCPEE] amendment request" to have the coyotes added to LCPEE #623 (staff brief at 7). As discussed above, the record establishes that respondent possessed six non-releasable coyotes long before she sought to add them to her LCPEE license (see supra at 4-6). The record also establishes that respondent retained possession of four non-releasable opossums long before she sought to add them to her LCPEE license (see supra at 6-7).

With regard to the chipmunks, the record establishes that respondent possessed three chipmunks prior to seeking to amend her LCPEE license (see exhibit 5 at 4-6 [letters attached to respondent's LCPEE #623 amendment request stating that the chipmunks she sought to add to her LCPEE license were "[n]on-releasable" before they were acquired by respondent]). Respondent argues, however, that the Department's allegations concerning her possession of the chipmunks should be rejected because they are an unprotected species and it "is not illegal [to possess] an unprotected species" (respondent brief at 13). At the hearing, Department staff's expert testified that chipmunks are "unprotected wildlife" under the ECL (tr at 55; see also ECL 11-0103 [defining terms as used in the Fish and Wildlife Law[5]]).

Department staff did not address the issue of unprotected wildlife in its closing brief. When questioned by respondent at the hearing, staff's expert testified that respondent's WLR license only "authorizes possession of wildlife for rehabilitation purposes" and further testified

---

[4] Department staff did not proffer testimony or other evidence at the hearing in relation to respondent's alleged violation of LCPEE #623 condition 12. In its closing brief, staff listed LCPEE #623 conditions 6, 10, and 22 as being "relevant to this proceeding," but omitted condition 12 (staff brief at 6-7). Given the foregoing, I deem staff's allegation concerning respondent's violation of condition 12 to be withdrawn.

[5] "Unprotected wildlife" is defined by reference to other terms (see ECL 11-0103[6][d]). Because chipmunks are not a listed species under any category of "[p]rotected wildlife," they are deemed unprotected wildlife (see ECL 11-0103[6][c]). Protected wildlife includes "[w]ild game," which in turn includes "[s]mall game" (see ECL 11-0103[2], [3]). "Small game" includes coyotes and opossums, but does not include chipmunks (see ECL 11-0103[2][c]).

9

that "Environmental Conservation Law 11-0515 prohibits possession without a license of wildlife" (tr at 55).

Although ECL 11-0515 requires a license to possess wildlife "for propagation, banding, scientific or exhibition purposes," there is no indication that respondent used the chipmunks in her possession for such purposes prior to requesting the amendment to her LCPEE license. Further, staff did not identify any provision of law or regulation that prohibits the mere possession of unprotected wildlife. I note that, with certain exceptions, ECL 11-0917(2) provides that "[u]nprotected wildlife may be possessed, transported, bought and sold without restriction."

I conclude that Department staff established that respondent violated LCPEE #623 condition 6 by acquiring and possessing coyotes and opossums that were, or became, non-releasable without a written amendment to LCPEE #623. I also conclude, however, that Department staff failed to establish that respondent held chipmunks in violation of condition 6 of LCPEE #623.

-- LCPEE #623 condition 10

LCPEE #623 condition 10 states that "[t]he licensee shall provide . . . caging facilities to ensure the physiological and psychological well-being of the listed animal(s)" (exhibit 2 at 2).

Department staff notes that, pursuant to LCPEE #623 condition 10, respondent was required to "provide food, water, care and caging facilities to ensure the physiological and psychological well-being of the listed animal(s)" (staff brief at 7 [citing exhibit 2]). Staff also notes that respondent pleaded guilty in Macedon Town Court, Criminal Part, to violations of two conditions set forth in LCPEE #623 (id. at 11; see also tr at 46-47 [Therrien testimony regarding the convictions]). Staff proffered the certificate of conviction from the Macedon Town Court which establishes that respondent pleaded guilty to violating condition 10 (see exhibit 13 at 2 [noting that respondent pleaded guilty (denoted as "PG" under the disposition column) to violating condition 10, as charged under ticket number BF0195322]; see also tr at 132 [Leo admission that she pleaded guilty to two violations]).

Respondent argues that "[t]he two convictions to which respondent pled in town court were baseless" (respondent brief at 6 [emphasis omitted]). Respondent argues that condition 10, which requires permittees to provide proper care and facilities for animals, is "very subjective" (id. at 7). Respondent states that the DEC Regional Wildlife Manager estimated that the opossum cages at the facility were approximately 3' x 2' x 2'[6] (id. [citing exhibit 8]). Respondent argues that the opossum cages at her facility are larger than the recommended minimum size set forth in Minimum Standards for Wildlife Rehabilitation (MSWR), a publication of the National Wildlife Rehabilitators Association (id. [citing exhibit 21 (excerpt from MSWR, 4th ed)]).

Respondent's arguments are unavailing. First, respondent's guilty plea in Macedon Town Court belies her assertion that the conviction was "baseless." Second, the violation alleged in the

---

[6] Enclosure dimensions are listed by width x length x height. Note that the DEC Regional Wildlife Rehabilitator estimated that the opossum cages at respondent's facility were approximately 3' x 3' x 2', slightly larger than stated by respondent (see exhibit 8 at 3 [item 6]).

10

notice of intent relates to respondent's LCPEE license, which authorizes the licensee to collect and possess wildlife.  The guidelines set forth in MSWR relate to enclosures for wildlife being rehabilitated and, therefore, do not apply to enclosures used for possessing wildlife long-term under an LCPEE license.  Indeed, respondent asserts that the 2' x 2' x 2' minimum housing guideline set forth in MSWR for opossums should apply to her facility (respondent brief at 7). That guideline, however, expressly states that it is for a "Restricted Injured Adult" opossum (exhibit 21 at 5).  Moreover, the minimum housing guidelines set forth in MSWR also state that opossums should be housed in an enclosure of at least a 10' x 12' x 8' when outside (id.).  At the time of the May 10, 2016 inspection, respondent had no outdoor enclosure for opossums (exhibit 8 at 3 [item 6]).

The lack of proper enclosures for the opossums was also identified during USDA inspections of the facility.  The USDA inspection report for April 21, 2016 states that "[t]he opossums are still housed in the barn in stacking stainless steel enclosures" that "do not provide sufficient space" (exhibit 15, Apr.21, 2016 inspection report at 1).  The report states that the opossums "need to be provided an enclosure that provides sufficient space for their health and well-being" (id. [also stating that opossums need "vertical space" and that they "walk [for] extended periods"]).  The lack of proper enclosures for the opossums was also cited in the prior USDA inspection report for the facility (id. Jan. 13, 2016 inspection report at 1).

I conclude that Department staff established that respondent violated LCPEE #623 condition 10 by failing to provide proper caging facilities for the opossums.

<u>Failure to Comply with the Terms of a Federal License</u>

Department staff's expert testified that "anyone who exhibits a mammal, warm blooded species, it's covered under the Animal Welfare Act, the federal act, and that's implemented by the U.S. Department of Agriculture" and they must "have a USDA Class C exhibitor's license" (tr at 40-41).  He further testified that the Department "require[s] a copy of the license as part of a completeness of an application that we would receive for a request for an exhibition license" (id.).

USDA conducts routine inspections of respondent's facility to ensure compliance with the requirements of the Animal Welfare Act and respondent's Class C license (tr at 41-42; see also exhibit 15 [copies of USDA inspection reports for respondent's facility]).  Department staff's expert testified that he was contacted by the USDA inspector assigned to respondent's facility and was informed that respondent "had refused the inspections of USDA [that are] required by the Animal Welfare Act" on three occasions (tr at 41).  Staff's expert further testified that respondent's refusal was "in violation of the Animal Welfare Act" (id.).

Respondent testified that she "was having some problems with [the USDA inspector] and . . . had levied a complaint by appealing one of [the inspector's] reports" (tr at 102).  She further testified that she "had to have the police take [the USDA inspector] off the land at one point because she had come out of her car to start an inspection literally yelling at me before I could even say anything" (tr at 104).  Respondent did not offer corroboration of this account and did not state when it allegedly occurred.

11

The USDA inspection report dated August 11, 2016 states that respondent refused to allow an inspection of the facility and that respondent told the inspectors "'you need to go' and proceeded to turn away from us and shut the door" (exhibit 15, Aug. 11, 2016 inspection report at 1 [citing 9 CFR 2.126(a) (access and inspection of records and property)]). The report further states that "[r]epeated refusal to allow [USDA Animal and Plant Health Inspection Service] officials to enter a facility . . . is a serious violation of the Animal Welfare Act" (id.). The record also shows that respondent had previously denied USDA inspectors access to the facility (id. July 27, 2016 inspection report at 1).

General condition 4.iv of respondent's LCPEE expressly provides that the license is subject to revocation if the "licensee fails to comply with any provisions of . . . Federal laws or regulations of the department directly related to the licensed activity" (exhibit 2 at 4). Although respondent asserts that one of the inspectors from USDA "had an agenda" (tr at 103), that does not justify respondent's decision to deny USDA inspectors access to the facility in violation of the Animal Welfare Act.

Notably, there are two USDA inspection reports in the record that detail respondent's refusal to allow access to her facility. Both inspection reports expressly state that the inspector with whom respondent took issue was accompanied by other USDA personnel at the time that respondent denied them access to her facility (see exhibit 15 Aug. 11, 2016 inspection report at 1; id., July 27, 2016 inspection report at 1-2 [also noting that a DEC Environmental Conservation Officer was present at the July 27, 2016 inspection]). These inspection reports reflect the USDA inspector's efforts to undertake the required inspections and respondent's continued denial of access to the facility.

I conclude that Department staff established that respondent violated LCPEE #623 general condition 4 by failing to comply with the terms of a federal license.

Other Arguments Raised by Respondent

In addition to respondent's arguments discussed above, I have considered the other arguments raised by respondent in her closing brief and find them to be without merit. I note, for example, that respondent maintains that "[t]here was virtually no investigation into [her] activities other than the obsession over coyote collars" (respondent's brief at 10). Respondent later asserts that Department staff's expert testified that "these [collars worn by the coyotes] are very egregious and serious offenses" (id. at 11 [citing tr at 48]). By inserting the phrase "collars worn by the coyotes," respondent misrepresents the witness's testimony.

Department staff's expert testified to several acts of respondent that he then characterized as "very egregious and serious offenses." He did not mention the collars, but rather testified that,

> "The persistent and consistent failure to adhere to license conditions, acquiring animals without amendments repeatedly. The failure to -- tied to the rehab license, but also dovetailing into the LCPEE, the failure to release animals, failure to either euthanize or transfer animals when necessary and also the violations, noncompliance with the federal license, the USDA Class C license, and really just

12

the nature of it as far as the -- the dangerous nature of the coyotes and the habituating of these animals" (tr at 47-48).

Accordingly, as reflected in the above testimony and the hearing record as a whole, respondent's argument that the Department failed to investigate her activities and was instead obsessed with the coyote collars is without merit.

<u>Disposition of Wildlife at Respondent's Facility</u>

Department staff notes that respondent still claims to hold a "small number of animals" at her facility under LCPEE #623 (staff closing brief at 13). Staff requests that the Commissioner direct respondent "to transfer or otherwise dispose of any and all wildlife previously held pursuant to [LCPEE #623] within a specified amount of time" (<u>id.</u>). Staff's request is appropriate and reasonable. Upon revocation of her LCPEE license, respondent will no longer have authorization from the Department to possess the animals listed on the license. Accordingly, I recommend that the Commissioner direct respondent to transfer or otherwise dispose of all wildlife held at the facility without proper authorization from the Department within 60 days of service of the Commissioner's order.

## CONCLUSIONS AND RECOMMENDATIONS

As detailed above, I conclude that Department staff has met its burden to establish that, as alleged in the notice of intent, respondent Carrie M. Leo (i) possessed wildlife without a proper license from the Department; (ii) failed to submit timely reports to the Department; (iii) failed to comply with the terms and conditions of LCPEE #623; and (iv) failed to comply with the terms of a federal license directly related to the activity authorized by LCPEE #623.

Accordingly, I recommend that the Commissioner issue an order revoking LCPEE #623. I further recommend that the Commissioner direct respondent to transfer or otherwise dispose of all wildlife held at the facility without proper authorization from the Department within 60 days of service of the Commissioner's order.

# EXHIBIT LIST

### Matter of Carrie Leo
### DEC Case No. OHMS 2017-72265

| Exhibit No. | Rec'd (Y/N) | Description |
|---|---|---|
| 1 | Y | Therrien Resume |
| 2 | Y | License to Collect or Possess (License #623) |
| 3 | Y | Notice of Intent to Revoke License #623 |
| 4 | Y | Wildlife Rehabilitation License (License #1646) |
| 5 | Y | Request to Amend License #623, March 24, 2016 |
| 6 | Y | Renewal Application for License #623, August 2, 2017 |
| 7 | Y | Email from Mike Wasilco, April 14, 2016 |
| 8 | Y | Email from Mike Wasilco, May 11, 2016 (with attachment) |
| 9 | Y | Tickets Issued to Respondent, Affirmed on July 27, 2016 |
| 10 | Y | Email from Willian Powell, May 11, 2016 (with attachment) |
| 12 | Y | Notice of Wildlife Rehabilitation License Renewal Denial |
| 13 | Y | Certificate of Conviction, dated December 13, 2017 |
| 14 | Y | Letter from Respondent, April 15, 2014 |
| 15 | Y | USDA Inspection Reports |
| 17 | Y | Photograph of Coyotes and Enclosure at Respondent's Facility |
| 18 | Y | Photograph of Coyotes and Enclosure at Respondent's Facility |
| 19 | Y | Photograph of Coyotes and Enclosure at Respondent's Facility |
| 20 | Y | Letter from James Albert, March 8, 2018 |
| 21 | Y | Minimum Housing Guidelines for Mammals |
| 22 | N | Photograph from Website of Veterinary Hospital Cages |
| 23 | Y | Letter from Laura Wade, March 12, 2018 |
| **Exhibits Marked for Identification But Not Offered** | | |
| 11 | N | DEC Call for Service (not offered at hearing) |
| 16 | N | FundRazr Funding Request (not offered at hearing) |